## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON MAXA, on behalf of themself and all others similarly situated,<br><br>   Plaintiff,<br><br> v.<br><br>APPLE INC.,<br><br>   Defendant. | **CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>Case No. 2:24-cv-639 |

   Plaintiff Aaron Maxa, on behalf of himself and all others similarly situated, brings this class action suit for damages and equitable relief against Defendant Apple Inc. ("Apple"). Plaintiff alleges the following based upon personal information as to allegations regarding himself, and the investigation of their counsel and on information and belief as to all other allegations:

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

PARTIES .............................................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 2

FACTUAL ALLEGATIONS ............................................................................... 2

    I.     Background ............................................................................................ 2

          A.     Smartphones and tablets are ultra-mobile and mobile computers. ..... 2

          B.     iOS and iPadOS devices exist in an ecosystem of third-party development. ...................................................................................... 5

    II.    The Relevant Product and Geographic Markets ................................... 7

          A.     Apple has a monopoly in the smartphone market. ............................. 7

          B.     Apple has a monopoly in the performance smartphone market. ........ 7

          C.     Apple attempts to monopolize the tablet market. ............................... 8

          D.     The United States is a relevant geographic market. ........................... 9

    III.   Apple has established and maintained monopoly power through unlawful conduct. ............................................................................................ 11

          A.     Apple blocks third-party access to important elements of the smartphone ecosystem, which allows it to erect barriers to customer switching. ...................................................................................... 12

               1.     Apple disfavors cross-platform messaging, creating barriers to switching. ......................................................................... 12

               2.     Apple controls access to digital wallet development, reinforcing barriers to switching. ................................................ 15

               3.     Apple disfavors rival smartwatches and degrades the cross-platform functionality of its own, creating and maintaining barriers to switching. ................................................................. 18

          B.     Apple stifles competition through its exercise of control over third-party app development, fostering continued dependence on Apple hardware. ...................................................................................... 20

               1.     Super apps foster consumer attachment to non-Apple software, so Apple bans them. .................................................. 21

               2.     Apple fosters dependence on its hardware by suppressing cloud-based applications. .......................................................... 22

IV.    Apple's anticompetitive behavior has harmful effects, which are not justified by procompetitive effects. .................................................................................. 24

ANTITRUST INJURY AND STANDING ............................................................................ 25

TOLLING OF THE STATUTE OF LIMITATIONS ............................................................. 26

CLASS ACTION ALLEGATIONS ..................................................................................... 27

FIRST CAUSE OF ACTION .............................................................................................. 31

SECOND CAUSE OF ACTION, IN THE ALTERNATIVE ................................................ 31

THIRD CAUSE OF ACTION ............................................................................................. 32

FOURTH CAUSE OF ACTION, IN THE ALTERNATIVE ................................................ 33

FIFTH CAUSE OF ACTION .............................................................................................. 34

SIXTH CAUSE OF ACTION .............................................................................................. 34

PRAYER FOR RELIEF ...................................................................................................... 35

DEMAND FOR JURY TRIAL ........................................................................................... 36

## NATURE OF THE ACTION

1.      Apple, one of the largest technology companies in the world, holds and actively unlawfully maintains monopoly in the United States markets for both smartphones and high-end, "performance" smartphones.

2.      Apple controls approximately 70 percent of the total smartphone market.

3.      Apple seeks to use its smartphone monopoly to exert anticompetitive influence in, and to attempt to monopolize, the tablet market.

4.      Apple seeks to lock customers into the Apple ecosystem, creating barriers that discourage users from switching to competing devices.

5.      It undertakes various anticompetitive behaviors to service its monopoly. These behaviors fall into two general categories: (1) decreasing the cross-platform functionality of iPhones by denying competitors full access to its features, thereby disfavoring competing products and making it more difficult for its users to switch competitors, (2) controlling app creation and distribution on the iOS operating system, ensuring that its users continue to depend on Apple hardware.

6.      Through these practices, Apple creates and maintains its monopoly, facilitating its extraction of monopoly rents from consumers and third parties, including app developers.

7.      Apple's monopolization of the smartphone and high-end "performance" smartphones markets is now the subject of a lawsuit brought by the United States and several states.[1]

8.      To hold Apple accountable for its unlawful monopolization, Plaintiff brings suit to represent individuals who purchased iPhones, Apple Watches, and iPads.

## PARTIES

9.      Plaintiff Aaron Maxa is an adult resident of Pennsylvania.

---

[1] *See United States v. Apple Inc.*, Case No. 2:24-cv-04055, ECF No. 1 (D.N.J. Mar. 21, 2024) ("DOJ Compl.").

10.     Plaintiff Maxa purchased and paid for an iPhone 14 Pro Max, Apple Watch Series 5, and iPad Series 6.

11.     Defendant Apple Inc. is a California corporation with its principal place of business in Cupertino. It is one of the largest technology companies in the world, with over one billion Apple devices in active use around the globe.

## JURISDICTION AND VENUE

12.     Plaintiff Aaron Maxa brings this action under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) and Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 16) on behalf of himself and on behalf of a class of all other similarly situated persons. Plaintiff seeks treble damages, injunctive relief, all other forms of just and reasonable relief, as well as reasonable attorneys' fees and costs.

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 class members are involved; and many members of the proposed Class are citizens of different states than the Defendant.

14.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337.

15.     This Court has personal jurisdiction over Apple and venue is proper in this District because Apple conducts business within and contacts with this District, and because its anticompetitive actions substantially harm its consumers in this District, including Plaintiff.

## FACTUAL ALLEGATIONS

I.      **Background**

        A.      **Smartphones and tablets are ultra-mobile and mobile computers.**

16.     Smartphones are a type of mobile phone with additional capabilities due to their advanced hardware and software. It combines the functions of a cell phone and a personal computer,

offering features like calling, texting, internet browsing, games, GPS navigation, and more. Smartphones typically use touchscreens for easy interaction and run on operating systems like iOS, allowing users to download and use various applications.

17.     Smartphones rely on semiconductor chipsets to function. These chipsets act as the brains of the phone, handling tasks like running software, displaying graphics, playing videos, storing data, and connecting to the internet.

18.     Chipsets with advanced capabilities, such as faster processing speeds and superior network connectivity, come at a higher cost. As a result, these chipsets are typically found in more expensive smartphones. These premium smartphones often boast additional features like high-resolution cameras, extended battery life, and sophisticated biometric authentication methods, such as facial recognition.

19.     Smartphones have various internal antennas that enable communication with other cellular phones, accessories, or devices. This communication occurs through commonly used protocols such as Wi-Fi, Bluetooth, and Near-Field Communications (NFC).

20.     Wi-Fi, a wireless networking technology, utilizes radio waves to provide high-speed internet access without the need for physical cables. This technology is used in various devices, including mobile phones, computers, printers, and other equipment. The term "Wi-Fi" refers to the IEEE 802.11 standards, which define the protocols that allow communication between devices equipped with Wi-Fi capability.

21.     Bluetooth enables cellular phones to communicate with accessories such as headphones and smartwatches using shortwave radio frequencies. An industry-standard for Bluetooth technology ensures that all Bluetooth-enabled devices can recognize and interact with each other.

22.     NFC allows cellular phones to interact with NFC-enabled devices, such as credit card terminals. NFC relies on short-range wireless technologies, including radio signals, to facilitate communication and information sharing.

23.     The software that controls a smartphone's hardware and other software programs is known as the operating system. Apple's iPhones come equipped with their own operating system, iOS, which cannot be found on devices from other manufacturers.

24.     In the United States, the only other widely used mobile operating system is Android, which is utilized by multiple smartphone makers including Samsung, Google, and Motorola.

25.     Tablets, such as Apple's iPad, are like scaled-up versions of modern smartphones. The iPad, for example, also runs on a similar iOS operating system, called iPadOS, so it exists in the same ecosystem.

26.     Apple engages in similar anticompetitive conduct with the iPad as it does with the iPhone, strangling third party app developers who might otherwise make apps that Apple deems would hurt its monopoly power, including super apps and cloud streaming game apps.

27.     Tablets may be used for distinct purposes compared to smartphones. Tablets are the size of small laptop computers and have hardware capabilities that allow them to fulfil additional functions that smartphones typically do not. iPads, for instance, have companion keyboards and touchscreen styluses, known as "pencils," which integrate seamlessly with the device.

28.     These features, combined with their size and, often, the superior computing power conferred by their advanced chipsets, means that they can fulfill a role that smartphones do not.

29.     Apple's guide for iPadOS developers notes that iPads function different from iPhones in their inputs, "People can interact with iPad using Multi-Touch gestures and onscreen keyboards, an attached keyboard or pointing device, Apple Pencil, or voice, and they often combine multiple input modes." It also notes that "app interactions," or simply said uses, are different:

Sometimes, people perform a few quick actions on their iPad. At other times, they spend hours immersed in games, media, content creation, or productivity tasks. People frequently have multiple apps open at the same time, and they appreciate viewing more than one app onscreen at once and taking advantage of inter-app capabilities like drag and drop.

**B.     iOS and iPadOS devices exist in an ecosystem of third-party development.**

30.     Applications, also referred to as "apps," are programs that run on a smartphone's operating system. The operating system acts as a platform and the apps create the functions that users enjoy.  To be more precise, apps interact with a smartphone's operating system through interfaces known as application programming interfaces, or APIs.

31.     These applications can be designed to fulfil a huge array of functions, and they stand as the user's point of contact with the smartphone. Users are always using an app when they use their smartphone.

32.     The continuous addition of new applications and features on a smartphone platform enhances the platform's appeal to users and, consequently, its profitability for the platform operator. Apple has granted access to its smartphone platform to external developers. These developers, through their numerous creations and advancements, have generated substantial value.

33.     As Apple notes to investors:

> The Company relies on the continued availability and development of compelling and innovative software applications for its products. The Company's products and operating systems are subject to rapid technological change, and when third-party developers are unable to or choose not to keep up with this pace of change, their applications can fail to take advantage of these changes to deliver improved customer experiences, can operate incorrectly, and can result in dissatisfied customers and lower customer demand for the Company's products.

Apple Annual Report (Form 10-K) (Sep. 30, 2023).

34.     This characteristic distinguishes smartphone platforms from other platforms, such as traditional landline telephone networks, where value-enhancing features were primarily developed by

the platform operator and access to third parties was only granted due to regulatory requirements. The creation of a valuable new iPhone feature by an external developer leads to increased consumer benefits and demand for Apple's products, thereby boosting the economic worth of the iPhone for Apple. This phenomenon has occurred countless times for the iPhone, culminating in an exceptionally profitable smartphone platform that reflects the collective contributions of a vast number of developers.

35.     The majority of app creators view Android and iOS as distinct platforms, each requiring separate development efforts. Consumers typically use only one type of smartphone, making it impossible for developers to reach users of one platform through apps built for the other. To maximize their reach, developers often create separate versions of their apps for both Android and iOS devices. These apps are designed to work specifically with one type of operating system and may not be compatible with other systems or allow for data synchronization across different platforms.

36.     The distinct user bases of Android and iOS necessitate separate development efforts from app creators. The single-device usage pattern of most consumers prevents developers from reaching users across both platforms with a single app. To maximize their reach, developers are compelled to create separate native apps for both iOS and Android, catering to each platform's specific requirements and user base.

37.     The need for cross-platform compatibility further drives the development of apps on both Android and iOS. Apps that facilitate interactions between users, such as dating or money-sharing apps, must ensure seamless functionality and communication between users on different platforms. This necessitates the creation of versions for both iOS and Android to enable user interactions across the platform divide.

38.     Software known as "middleware" offers a solution to the compatibility challenges faced by app developers. Middleware provides a standardized set of tools and functions that work

across various operating systems and devices. This allows developers to build applications that can run on different platforms without needing to write unique code for each one. Instead of relying on operating system-specific tools, developers can utilize the tools provided by the middleware.

39. Apple has acknowledged the role of such middleware in expanding the reach of applications and fostering competition within the app development industry.

40. Imposing restrictions on the features and functionalities developed by third-party developers diminishes the iPhone's appeal and deprives Apple of the potential economic gains it could accrue as the platform operator. From an economic standpoint, it is illogical for Apple to forgo the profits it could generate from new features and functionalities unless there exists a compelling justification, such as safeguarding monopoly profits.

## II.      The Relevant Product and Geographic Markets

### A.      Apple has a monopoly in the smartphone market.

41. Smartphones are a relevant product market. Smartphones are distinct from and not substitutable with less capable web-enabled phones, known as "feature phones," which offer only a limited menu of features, typically with lower-performing hardware.

42. Smartphones are also distinct from and not substitutable with other sorts of mobile computer devices, such as tablets, smartwatches, and laptop computers. Those devices each offer a completely different mix of size and performance.

43. Competition from other sorts of phones or mobile computing devices is insufficient to prevent Apple from exercising monopoly power in the smartphone market.

### B.      Apple has a monopoly in the performance smartphone market.

44. Performance smartphones are a relevant product market within the smartphone market. This narrower market includes those smartphones that compete with most iPhones.

45.     This market excludes the lowest-end smartphones, which industry participants sometimes refer to as "entry-level" smartphones. Performance smartphones are distinct from and not substitutable with entry-level smartphones.

46.     Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (e.g., plastic instead of metal and glass). They have lower-performance components such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

47.     Industry participants recognize performance smartphones as distinct and frequently group smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship." Apple has also long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. Its documents indicate it does not view entry-level smartphones as competing with the iPhone and other performance smartphones.

48.     Apple estimates its market share exceeds 70 percent of the performance smartphone market.[2]

**C.     Apple attempts to monopolize the tablet market.**

49.     Tablets are a relevant product market.

50.     Tablets are similar to smartphones or performance smartphones in many ways, but their combination of characteristics renders them distinct.

---

[2] DOJ Compl. ¶ 181.

51.     Tablets are physically much larger than smartphones, making them far less portable but giving users a far larger display. They also generally have more computing power.

52.     Consumers could not and do not substitute a tablet for a smartphone, or vice versa. Consumers who buy a tablet typically also typically own a smartphone.

53.     Consumers could not and do not substitute a personal computer with a tablet, or vice versa. Tablets are generally more portable and lightweight compared to most personal computers, especially desktop PCs. This makes them more convenient for on-the-go use, such as reading, browsing the web, or consuming media while traveling. PCs, particularly desktops, are typically bulkier and less mobile.

54.     Apple uses its monopoly power in the smartphone and performance smartphone markets to attempt to monopolize the tablet market.

55.     As of December 2023, some 43% of all tablets owned in the United States were an Apple tablet.[3] Apple tablets like the iPad use iOS.

56.     In recent years Apple's share of the U.S. tablet market has grown. In the first quarter of 2023, for example, Apple new tablet shipments held a market share of 50.0%, compared with a share of 38.6% in the prior year.[4]

**D.     The United States is a relevant geographic market.**

57.     The United States is a relevant geographic market for the sale of smartphones and performance smartphones, as well as tablets. Though Apple sells devices globally, users of these devices remain confined by geographical boundaries.

58.     Individuals purchasing smartphones in the U.S. require services provided by American telecommunication companies ("carriers"). The majority of American consumers seeking high-end

---

[3] https://www.statista.com/forecasts/997209/tablet-ownership-by-brand-in-the-us.

[4] https://www.canalys.com/newsroom/us-pc-and-tablet-market-q1-2023.

smartphones primarily utilize their devices within the U.S. and depend on service plans from American telecommunication providers to access cellular and mobile networks. The same is true for wireless-enabled tablets.

59.     A smartphone or wireless-enable tablet purchased abroad for use in the United States might be incompatible with the consumer's domestic cellular carrier, may not have the necessary radio technology to take advantage of the carrier's highest speed connections, the carrier might not be able to offer support during setup or subsequently, or the phone's warranty may be invalid.

60.     Consumers must also purchase smartphones or wireless-enabled tablets through a U.S. retailer if they want to take advantage of valuable promotions offered by their mobile carrier. These same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries.

61.     Users in the United States also demand services offered by U.S. retailers when they purchase a smartphone or wireless-enable tablet, such as assistance with activation, setup, and data transfer.

62.     The United States smartphone and tablet markets are also isolated by the regulatory environment. Potential entrants into the U.S. smartphone and performance smartphone markets face regulatory hurdles and legal obligations related to telecommunications. These restrictions effectively bar some smartphone makers from offering their smartphones to U.S. consumers.

63.     Because of the isolation of the United States smartphone and performance smartphone markets, U.S. consumers cannot avoid or defeat increases in the price of smartphones or performance smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those in other countries.

III.    **Apple has established and maintained monopoly power through unlawful conduct.**

64.    Apple has built a fortress around its flagship product, the iPhone, by administering and withholding software and services in ways that minimize competition, locking users in and competitors out.

65.    At the heart of this strategy lies iOS, the operating system that powers the iPhone and iPad. Unlike the Android operating system, its main competitor, iOS is exclusively available on Apple devices. This exclusivity gives Apple immense control over the user experience, dictating everything from the interface to the available apps.

66.    The control Apple exerts leaves both app developers and Apple users with no alternatives, regardless of cost or quality differences. Apple ensures its own continued profit from the efforts of third-party developers and other platform contributors, all while shielding itself from any competitive challenges these same participants might pose to its monopoly over the smartphone market.

67.    Most measurements of Apple's dominance likely understate the company's true monopoly power, as its market share is shielded by formidable obstacles to entry, network effects, and switching costs. Apple leverages its position to suppress competition from alternative platforms and stifle any innovations, products, and services that could potentially reduce consumer dependence on the iPhone.

68.    The cost of an iPhone has risen steadily and sharply over time. The iPhone 4, upon its release in June 2010, was priced at $199. In contrast, the 2023 iPhone 15 models debuted with a base model priced at $799, a Plus model at $899, "X" and "Pro" models at $999, and a "Pro Max" model reaching $1,199.

A.     **Apple blocks third-party access to important elements of the smartphone ecosystem, which allows it to erect barriers to customer switching.**

1.     **Apple disfavors cross-platform messaging, creating barriers to switching.**

69.     Apple undermines cross-platform messaging to reinforce "obstacle[s] to iPhone families giving their kids Android phones."[5] Apple could have made a better cross-platform messaging experience itself by creating Messages for Android but concluded that doing so "will hurt us more than help us."[6] Said simply, Apple continues to impede innovation in smartphone messaging, sacrificing the profits Apple would earn from increasing the value of the iPhone to users, because its monopoly is more valuable than those potential profits.

70.     Messaging apps are critical aspects of smartphones, fulfilling one of the core functions for which users turn to smartphones. Users may open messaging apps many times per day to communicate for personal and professional purposes.

71.     Messaging applications use common "protocols" to enable communication between devices. These protocols dictate the features available to the user in any given messaging app.

72.     SMS is one important messaging protocol, receivable by all modern mobile phones. It offers a broad user network, but limited functionality for file sharing, messaging editing, message tagging, and other such features.

73.     Messaging apps may use proprietary protocols called over the top protocols ("OTT"). These offer enhanced security richer suite of features, but require that sending and receiving users communicate through the same app.

74.     Apple allows only its own messaging app, Messages, to take advantage of both SMS and OTT protocols. Apple designates the APIs needed to implement SMS as "private," meaning third-

---

[5] DOJ Compl. ¶ 79.

[6] DOJ Compl. ¶ 79.

party developers have no technical means of accessing them and are prohibited from doing so under Apple's contractual agreements with developers. As a result, third-party messaging apps cannot combine the broad functionality of SMS with the advanced features of OTT messaging.

75.    Though this denial, Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users.

76.    Apple also prohibits third-party developers from incorporating other important features into their messaging apps. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.

77.    If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers—as they have already done on Android.

78.    Moreover, messaging apps benefit from significant network effects—as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third-party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

79.     Apple has stated that it plans to incorporate more advanced features for cross-platform messaging in Apple Messages by adopting a 2019 version of the RCS protocol (which combines aspects of SMS and OTT), though it has not done so yet. Regardless, this would not undermine Apple's efforts to undermine third-party messaging apps because third-party messaging apps will still be prohibited from incorporating RCS just as they are prohibited from incorporating SMS. Moreover, the RCS standard will continue to improve over time, and if Apple does not support later versions of RCS, cross-platform messaging using RCS could soon be broken on iPhones anyway.

80.     Apple also uses its control over messaging to affirmatively undermine the quality of rival smartphones. For example, if an iPhone user messages a non-iPhone user in Apple Messages— the default messaging app on an iPhone—then the text appears to the iPhone user as a green bubble and incorporates limited functionality: the conversation is not encrypted, videos are transmitted in low resolution, and users cannot edit messages, see typing indicators, or react to messages, or use other common features.

81.     These issues significantly increase switching costs by signaling to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse. It does not matter that Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for "breaking" chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers—who use iPhones at a rate of over 85 percent, according to one survey.

82.     Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Apple's Senior Vice President of Software Engineering explained

that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones."[7]

83.    In March 2016, Apple's Senior Vice President of Worldwide Marketing forwarded an email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more than help us."[8]

84.    At a media conference in September 2022, Apple CEO Tim Cook famously told a reporter to "Buy your mom an iPhone" if you are bothered by the diminished features available when messaging family who use non-Apple smartphones in Apple Messages.[9]

### 2.    Apple controls access to digital wallet development, reinforcing barriers to switching.

85.    Digital wallets, which allow users to keep and use digital copies of payments cards, tickets, ID cards, and more, have become very popular. The U.S. Consumer Financial Protection Bureau estimates yearly digital wallet transaction volume will expand to $451 billion by 2028.

86.    Apple Wallet is Apple's proprietary digital wallet on the iPhone. Apple Wallet incorporates Apple's proprietary payment system Apple Pay, which processes digital payments on the web, in apps, and at merchant points of sale.

87.    iPhone users commonly make use of Apple Wallet, but Apple envisions that it will grow to become a single app for shopping, digital keys, transit, identification, travel, entertainment, and more. Thus, switching to a different smartphone requires leaving behind the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet.

---

[7] DOJ Compl. ¶ 91.

[8] DOJ Compl. ¶ 91.

[9] https://www.cnet.com/tech/mobile/tim-cooks-fix-for-android-texting-woes-buy-your-mom-an-iphone/.

88.     Apple has used its control over app creation to effectively block third-party developers from creating digital wallets on the iPhone with tap-to-pay functionality, without which digital wallets have limited use. Apple also deprives users of the benefits and innovations third-party wallets would provide so that it can protect its iPhone business.

89.     Apple uses its control over app creation and API access to selectively prohibit developers from accessing the near-field communication (NFC) hardware needed to provide tap-to-pay through a digital wallet app.

90.     Apple Wallet is the only app on the iPhone that can use NFC necessary for tap-to-pay. While Apple actively encourages banks, merchants, and other parties to participate in Apple Wallet, Apple simultaneously exerts its smartphone monopoly to block these same partners from developing better payment products and services for iPhone users.

91.     There is no technical limitation to providing NFC access to would-be digital wallet developers. Merchants are able to use the iPhone's NFC antenna to accept tap-to-pay payments from consumers; only developers are not.

92.     Apple also blocks other digital wallets from facilitating in-app payment. The serves to make the user experience for competing digital wallets even worse. Apple even prohibits developers on its App Store from notifying users in the developer's app that cheaper prices for services are available using alternative digital wallets or direct payments.

93.     Absent Apple's conduct, cross-platform digital wallets made by third party developers could be used to manage and pay for subscriptions and in-app purchases.

94.     Cross-platform digital wallets could offer an easier, more seamless, and potentially more secure way for users to switch from the iPhone to another smartphone. If third-party developers could create cross-platform wallets, users transitioning away from the iPhone could continue to use

the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment contacts, and other information, making it easier to switch smartphones.

95.     And because many users already use apps created by their preferred financial institutions, if these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple.

96.     Apple also uses its smartphone monopoly to extract payments from banks, which need to access customers that use digital wallets on iPhones. Since Apple first launched Apple Pay—long before it achieved meaningful adoption—Apple has charged issuing banks 15 basis points (0.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks.

97.     Apple's fees are a significant expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users. The volume of impacted transactions is large and growing. A U.S. Consumer Financial Protection Bureau report estimates that Apple Pay facilitated nearly $200 billion in transactions in the United States in 2022. And the report goes on to explain that "analysts estimate that the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."[10]

98.     Apple's conduct reflects its knowing degradation of the experience of its own users by blocking them from accessing wallets that would have better or different features. In so doing, Apple cements reliance on the iPhone and continues to extract monopoly rents from digital wallet transactions.

---

[10] DOJ Compl. ¶ 113.

3. **Apple disfavors rival smartwatches and degrades the cross-platform functionality of its own, creating and maintaining barriers to switching.**

99.     Smartwatches are wrist-worn devices that function like small computers—or smartphones—fulfilling many functions, including collection and monitoring of biometric data, responding to messages and notifications, and performing mobile payments through the same digital wallet technology as the iPhone.

100.     Smartwatches usually must be paired with a smartphone to operate fully, such as by receiving and responding to emails and text messages or answering phone calls. They are in many ways expensive companion devices for smartphones.

101.     Apple gets smartwatches onto wrists because competing smartwatches pose a competitive threat to its iPhone monopoly. As users interact with a smartwatch, users rely less on a smartphone's proprietary software and more on the smartwatch itself. They touch their watch instead of their phone. This makes them less attached to their phone, and would potentially make it easier to switch.

102.     Apple's smartwatch—the Apple Watch—is only compatible with the iPhone, by design. Apple's intent is to increase stickiness, to further discourage customers from switching to rivals. If a customer enjoys the Apple Watch they will have to continue being an Apple customer to use it.

103.     By contrast, cross-platform smartwatches can reduce iPhone users' dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone (or vice versa) by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth.

104.    Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, in a 2019 email the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching."[11] Surveys have reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

105.    While ensuring the Apple Watch cannot function with non-Apple smartphones, Apple also degrades the functionality of third-party smartwatches paired with iPhones. It uses its control of the iPhone, including its technical and contractual control of critical APIs, to do this in at least three significant ways:

106.    **First**, Apple prevents iPhone with third-party smartwatches from responding to notifications on their watches. The ability to respond to notifications directly from a smartwatch is one of the top considerations for smartwatch purchasers—and one of the most used product features when it is available. It is one the principal purposes of the watch.

107.    Apple formerly allowed iPhones to connect fully with third-party smartwatches, including through notifications. Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation.

108.    The year Apple introduced the Apple Watch, it began limiting third-party access to new and improved APIs for smartwatch functionality. Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch.

---

[11] DOJ Compl. ¶ 98.

109. **Second**, Apple ensures third-party smartwatches connect unreliably with the iPhone. A reliable Bluetooth connection is essential for a smartwatch to function in its intended role as a companion to the user's smartphone. Apple Watches, therefore, can maintain a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. But Apple prevents third-party smartwatches from using this feature. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch with their iPhone.

110. Apple also requires users to turn on "Background App Refresh" and disable the battery-saving "Low Power Mode" in their iPhone settings for third-party smartwatches to remain consistently connected to iPhone, hurting battery life. Apple does not impose similar requirements for Apple Watch.

111. **Third**, Apple degrades the full functionality of cellular-enabled third-party smartwatches. Cellular-enabled smartwatches incorporate the ability to connect directly to a cellular network, allowing users to make calls, send messages, and download data even if their smartwatch is not paired to a smartphone. Apple Watch users can use the same phone number for their smartphone and smartwatch when connected to the cellular network. As a result, messages are delivered to both the user's smartphone and smartwatch, providing an integrated messaging experience.

112. To do the same on a third-party smartwatch connected with an iPhone, Apple arbitrarily requires the users to disable Apple's iMessage service within Apple Messages. For many of the reasons described above with respect to Apple's intentional degradation of quality of messaging to non-Apple smartphones, many or most users do not want to disable iMessage. In practice, iPhone users with a third-party smartwatch must maintain separate phone numbers for the two devices.

**B. Apple stifles competition through its exercise of control over third-party app development, fostering continued dependence on Apple hardware.**

113. As noted above, third-party software development brings Apple enormous economic value.

114.    Every decision Apple makes that constrains third-party development hurts Apple's short-term economic prospects. The more onerous it is for developers to make apps for iOS, the fewer will do so. And the less development there is, the less compelling iPhones are to consumers.

115.    All the same, Apple does take steps to constrain third-party development. In fact, it methodically ensures that huge categories of apps stay off of iOS and iPadOS devices, including smartphones and tablets. It does this to protect its monopoly profits by keeping its users away from app that might foster attachment to the app rather than to Apple hardware.

### 1.    Super apps foster consumer attachment to non-Apple software, so Apple bans them.

116.    Super apps are a species of mobile application that can act as platforms for multiple functions. They are a sort of middleware, allowing developers to build smaller "mini" apps inside them.

117.    Critically these apps allow developers build on top of the super app rather than the mobile operating system, enabling them to build a truly function cross-platform user experience, whether on mobile—regardless of hardware brand—or web.

118.    As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. Eventually, users become more willing to choose a different smartphone because they can access the same interface, apps, and content they desire on any smartphone where the super app is also present.

119.    Moreover, developers can write mini programs that run on the super app without having to write separate apps for iPhones and other smartphones. This lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers, and reduces switching costs.

120.    Apple is cognizant that super apps are potentially harmful to its maintenance of customer brand loyalty, and therefore it bans them. As one Apple manager put it, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let

the barbarians in at the gate." When a super app offers popular mini programs, "iOS stickiness goes down."[12]

121.    There are no common American examples of these super apps, in large part because of Apple's monopolistic dominance. Super apps are common in Asia. Prominent examples include WeChat, Alipay, and Meituan.

122.    On iPhone, the only app platform is the iOS operating system itself, and the only marketplace for apps is Apple's own App Store.

### 2.    Apple fosters dependence on its hardware by suppressing cloud-based applications.

123.    Cloud computing applications can be hugely beneficial to the user. These apps render hardware less significant by allowing computation to occur remotely, on a computer other than the smartphone running the app. Cloud gaming apps, for instance, can deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware.

124.    As with super apps, cloud computing apps also aid developers by allowing them to create a cross-platform experience. Apps that run in the cloud can be functionally the same on any operating system.

125.    Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

126.    For the monopolist, however, cloud computing is a dangerous threat to profits. In the now-famous words of one Apple employee, it sought to avoid a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage

---

[12] DOJ Compl. ¶ 65.

sale and . . . have a solid cloud computing device" that "works fine."[13] iPhones cost much more than $25.

127.    Apple has continually undermined the viability of cloud streaming apps in a variety of ways.

128.    For years, Apple required that any cloud streaming game—or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users.

129.    Apple also forces cloud games to use Apple's proprietary payment system and necessitates overhauls of games and their payment systems specifically for the iPhone. Apple intentionally prevents the creation a single cloud-based version that is compatible with several operating systems, including iOS.

130.    Apple's suppression of cloud-based apps is an intentional suppression of competition. As noted by an Apple employee, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming," but applies to "a number of high-compute requirement applications."[14]

---

[13] DOJ Compl. ¶ 71.
[14] DOJ Compl. ¶ 79.

**IV.     Apple's anticompetitive behavior has harmful effects, which are not justified by procompetitive effects.**

131.     There are no valid, procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's anticompetitive conduct has not resulted in lower prices, higher output, improved innovation, or a better user experience for smartphone users.

132.     Apple's actions have negatively impacted users in various ways. For instance, the absence of third-party digital wallets deprives smartphone users of potentially superior rewards programs and more secure, private payment options directly through their preferred financial institutions.

133.     Apple's anti-competitive behavior has effectively prevented the emergence of these tap-to-pay digital wallet products and services, limiting user choices and hindering innovation in the mobile payment space.

134.     Apple differentiates itself in the limited smartphone market by emphasizing user privacy and security. However, neither these claims nor the principles behind them justify Apple's monopolistic and anticompetitive behavior. Apple's control over app distribution and development on iPhones is excessive and unnecessary for protecting user privacy and security. This is evident when compared to Apple's approach with Mac laptops and computers, where developers have the freedom to distribute software directly to consumers without using an Apple-controlled app store or paying associated fees, while Mac users still maintain a safe and secure experience.

135.     Apple's actions suppress alternative technologies that could potentially enhance user security and privacy. For instance, Apple's restrictions on digital wallets force users to share information with Apple, even if they prefer to share it only with their bank, medical provider, or other trusted entities. When an iPhone user adds a credit or debit card to Apple Wallet, Apple inserts itself into a process that could occur directly between the user and the card issuer, creating an additional point of vulnerability for privacy and security.

136.     Similarly, super apps or alternative app stores could provide users with a more carefully selected range of apps that prioritize user privacy and security.

137.     Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones, it has been reported, are unencrypted because of Apple's conduct. Apple could allow iPhone users to send encrypted messages to Android users while still using Messages on their iPhone, which would improve the privacy and security of iPhone and other smartphone users. But it does not.

### ANTITRUST INJURY AND STANDING

138.     Plaintiff suffered overcharge damages when he purchased an iPhone, Apple Watch, and iPad at prices alleged to be inflated by Apple's unlawful anticompetitive conduct and monopolization.

139.     Plaintiff has standing as a purchaser of products sold at inflated prices.

140.     Plaintiff purchased its price-inflated Apple devices from its wireless carrier, but the monopoly profits accrue to Apple. Wireless carriers do not profit from Apple's monopoly.[15]

141.     Wireless carriers charge the same iPhone retail prices that Apple does.

142.     These inflated prices are an intentional and direct effect of Apple's anticompetitive conduct and monopolization.

143.     Unless and until the Court restricts Apple's conduct, Plaintiff and similarly situation individuals, numbering in the millions, will likely continue to be damaged by overcharging in the future.

---

[15] *See, e.g.,* https://finance.yahoo.com/news/wireless-carriers-lose-billions-smartphone-102001928.html. ("'Lower equipment sales are a good thing for the carriers,' New Street Research LLP Managing Partner Jonathan Chaplin said, as they often lose money on smartphone sales due to promotional discounts. 'If the upgrade rate declines, they are subsidizing fewer handsets, and their margins expand,' he said.").

144.    The harm of overcharging and the thread of future overcharging are cognizable antitrust injuries caused by Defendant's conduct.

## TOLLING OF THE STATUTE OF LIMITATIONS

145.    Consumers were unaware of any potential issues with Apple's business practices before the Department of Justice initiated legal action. They lacked the necessary information to suspect or identify any anti-competitive behavior.  Therefore, the statute of limitations for these claims should be suspended due to the concealed nature of Apple's actions.

146.    Plaintiff alleges ongoing harmful conduct by Apple within the relevant timeframe, causing continuous and accumulating damage to consumers.

147.    The average consumer's interaction with Apple was limited to purchasing products, with no direct contact or other means to uncover any potential misconduct. Publicly available information did not provide any indication of Apple's alleged monopoly or its impact on product pricing.

148.    Plaintiff alleges that Apple engaged in a deliberate scheme to actively conceal its unlawful monopoly and exclusionary tactics within the relevant markets. Instead of being transparent about its actions, Apple actively denied any involvement in such conduct. Despite facing accusations from both U.S. and international regulatory bodies regarding the abuse of market power and engagement in anticompetitive practices, Apple repeatedly and publicly refuted these claims.

149.    This alleged deception led consumers, including Plaintiff and the class members, to believe that the market for consumer electronics like iPhones operated under fair competition. Given the regulatory oversight of this market, it was reasonable for consumers to assume iPhones were priced competitively. Prior to the emergence of these claims and the Department of Justice lawsuit on March 21, 2024, a reasonable individual would not have suspected that iPhones were being sold at inflated prices.

## CLASS ACTION ALLEGATIONS

150.    Plaintiff brings this action on behalf of themself and on behalf of the following proposed Classes, initially defined as follows:

> All persons or entities that purchased an iPhone, either directly from Apple or indirectly from a third party  (the "iPhone class")

> All persons or entities that purchased an Apple Smart Watch, either directly from Apple or indirectly from a third party (the "Smart Watch Class")

> All persons or entities that purchased an iPad, either directly from Apple or indirectly from a third party (the "iPad class")

151.    Excluded from the classes are Apple, its parent companies, subsidiaries, affiliates, officers, directors, and employees.

152.    Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

153.    The claims of all class members derive directly from a single course of conduct by the Defendant. Defendant has engaged and continues to engage in uniform and standardized conduct toward the putative class members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

154.    Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

155.    Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

156.     Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

157.     **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Class so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the Classes includes millions of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendants' records.

158.     **Ascertainability.** The Classes are ascertainable because its members can be readily identified using business records, and other information kept by Defendants in the usual course of business and within their control or Plaintiff and the Classes themselves. Plaintiff anticipates providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to Court order.

159.     **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. The common legal and factual questions include, without limitation:

(a)     Whether there are relevant antitrust product markets of smartphones, performance smartphones, tablets, and smartwatches

(b)     Whether Apple has unlawfully monopolized the relevant antitrust product markets;

(c)     Whether Apple has attempted to monopolize the relevant antitrust product markets;

(d)     Whether Plaintiff and the members of the proposed class have been harmed by Apple's anticompetitive conduct, including but not limited to by paying for higher prices for smartphones, tablets, or smartwatches;

(e)     Whether Plaintiff and the members of the proposed class are entitled to injunctive, declaratory, or monetary relief, including restitution.

160.     **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative Class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all Class members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

161.     **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because their interests do not conflict with the interests of the Class members, and they have retained counsel competent and experienced in complex class action, business competition, and consumer litigation. Plaintiff and their counsel will fairly and adequately protect the interest of the class members.

162.     **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members. There is no special interest in Class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. And, even if Class members themselves could afford

such individual litigation; the court system could not, given the thousands or even millions of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

163.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(f)     the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant; or

(g)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(h)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

**FIRST CAUSE OF ACTION**

**Monopolization of the Performance Smartphone Market in the United States in Violation of Section 2 of the Sherman Act**

164.  Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

165.  Performance smartphones are a relevant product market.

166.  The United States is a relevant geographic market for performance smartphones.

167.  Apple possess monopoly power in the market for performance smartphones.

168.  Through the anticompetitive course of conduct described herein, Apple has willfully created and maintained that monopoly power.

169.  While each of Apple's acts is anticompetitive or exclusionary in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

170.  Apple has acted with specific intent to monopolize this market, and will likely continue to do so unless and until it is restrained by the Court.

171.  Plaintiff and the Classes have been injured and will be injured by Apple's conduct.

172.  Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION, IN THE ALTERNATIVE**

**Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Section 2 of the Sherman Act**

173.  Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

174.  Performance smartphones are a relevant product market.

175.  The United States is a relevant geographic market for performance smartphones.

176.     Apple has attempted to monopolize the market for performance smartphones in the United States.

177.     Through the anticompetitive course of conduct described herein, Apple has willfully created and maintained that monopoly power.

178.     While each of Apple's acts is anticompetitive or exclusionary in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

179.     Apple has acted with specific intent to monopolize this market, and will likely succeed in doing so unless and until it is restrained by the Court.

180.     Plaintiff and the Classes have been injured and will be injured by Apple's conduct.

181.     Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### Monopolization of the Smartphone Market in Violation of Section 2 of the Sherman Act

182.     Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

183.     Smartphones are a relevant product market.

184.     The United States is a relevant geographic market for smartphones.

185.     Apple possess monopoly power in the market for smartphones.

186.     Through the anticompetitive course of conduct described herein, Apple has willfully created and maintained that monopoly power.

187.     While each of Apple's acts is anticompetitive or exclusionary in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

188.   Apple has acted with specific intent to monopolize this market, and will likely continue to do so unless and until it is restrained by the Court.

189.   Plaintiff and the Classes have been injured and will be injured by Apple's conduct.

190.   Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION, IN THE ALTERNATIVE

## Attempted Monopolization of the Smartphone Market in the United States in Violation of Section 2 of the Sherman Act

191.   Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

192.   Smartphones are a relevant product market.

193.   The United States is a relevant geographic market for smartphones.

194.   Apple has attempted to monopolize the market for smartphones in the United States.

195.   Through the anticompetitive course of conduct described herein, Apple has willfully created and maintained that monopoly power.

196.   While each of Apple's acts is anticompetitive or exclusionary in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

197.   Apple has acted with specific intent to monopolize this market, and will likely succeed in doing so unless and until it is restrained by the Court.

198.   Plaintiff and the Classes have been injured and will be injured by Apple's conduct.

199.   Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

## Tying (of Smartwatches to Smartphones) in Violation of Sections 1 and 3 of the Sherman Act

200.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

201.    Smartwatches are a relevant market distinct from smartphone markets.

202.    Through the anticompetitive actions described herein, Apple has unlawfully tied its smartwatches to its smartphones and performance smartphones, products in separate markets.

203.    There is no valid procompetitive behind Apple's tying actions.

204.    Plaintiff and the Classes have been and will be injured by Apple's conduct.

205.    Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

## Attempted Monopolization of the Tablet Market in the United States in Violation of Section 2 of the Sherman Act

206.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

207.    Tablets are a relevant product market.

208.    The United States is a relevant geographic market for tablets.

209.    Apple has attempted to monopolize the tablet market in the United States.

210.    Through the anticompetitive course of conduct described herein, Apple has willfully created and maintained monopoly power.

211.    While each of Apple's acts is anticompetitive or exclusionary in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

212.     Apple has acted with specific intent to monopolize this market, and has a dangerous probability of succeeding in doing so unless and until it is restrained by the Court.

213.     Plaintiff and the Classes have been injured and will be injured by Apple's conduct.

214.     Plaintiff and the Classes are entitled to injunctive relief and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, pray for relief and judgment against Defendants as follows:

A.     certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B.     awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.     awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D.     awarding Plaintiff and the Classes punitive damages;

E.     awarding Plaintiff and the Classes civil penalties;

F.     granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G.     enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.     awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.      awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by

law;

J.      awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Classes hereby demand a trial by jury on all issues so triable.


Dated: April 29, 2024                          **JANOVE PLLC**

By:   _/s/ Raphael Janove_
Raphael Janove
PA Bar #328568
1617 John F. Kennedy Blvd, 20th Fl.
Philadelphia, PA 19103
Raphael@Janove.law

*Attorneys for Plaintiff and the Proposed Classes*